UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:22-cr-217 (DLF) |
| v. | : | |
| | : | |
| LUIS HALLON, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Luis Hallon to 21 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

I. **Introduction**

Luis Hallon, a 67-year-old retiree, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Hallon pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 21 days incarceration is appropriate in this case because Hallon (1) observed violence in and around the U.S. Capitol Grounds; (2) observed and was the subject of police-directed crowd control measures, such as tear gas, used to try to prevent rioters from gaining entry to the U.S. Capitol Building; (3) entered the U.S. Capitol Building through the Columbus Doors on the East Front of the Capitol while filming and taking photos of the violence taking place; (4)

1

witnessed police officers clearing the Rotunda with force but did not immediately heed those instructions; (5) minimized his unlawful conduct in an email that he sent to FBI agents in May 2021; and (6) has not, to date, genuinely expressed sincere remorse of his unlawful conduct on January 6.

The Court must also consider that Hallon's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Hallon's crime support a sentence of 21 days in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 25 (Statement of Offense), at 1-7.

*Defendant Hallon's Role in the January 6, 2021 Attack on the Capitol*

Luis Hallon lives in St. Cloud, Florida. On January 4, 2021, Hallon left his home in Florida and traveled to Washington, D.C. with his co-defendant and partner, Traci Isaacs, Isaacs's nephew, William Isaacs, and Leslie Gray. Hallon is partnered with Traci Isaacs, who was a member of the Oath Keepers on January 6, 2021.

After arrival in Washington D.C. on January 6, 2021, Hallon and Traci Isaacs[1] met up with others around 12:00 p.m. Hallon and Traci Isaacs later marched to the Capitol where they joined the protest of Congress' certification of the Electoral College outside the East Front of the

---

[1] For clarity, this memo will refer to Traci Isaacs as "Isaacs" and William Isaacs as "William,"

2

Capitol. Isaacs posted a video of herself on Facebook "storming the capitol," along with a picture of herself with a man in full tactical gear. *See* Image 1, below.

Image 1



Hallon and Isaacs initially joined the crowd gathered at the perimeter of the Capitol grounds, which was barricaded and patrolled by police officers. After about 1 hour of protests, the crowd, including Hallon and Traci Isaacs, pushed past the barricades surrounding the restricted perimeter and to the steps along the East Front of the Capitol. Along with the crowd, Hallon advanced up the steps of the U.S. Capitol. Police fired tear gas at the rioters on the East Front steps of the Capitol, including Hallon and Isaacs, which caused their eyes to burn. This did not deter Hallon and Isaacs, who regrouped and pushed forward. Hallon and Traci Isaacs entered the Capitol Building via the Columbus Doors at approximately 3:02 p.m. on January 6, 2021.

While inside, Hallon and Isaacs took pictures and entered the main Rotunda area. *See* Images 2 and 3 below—Hallon circled in green, Isaacs in red.

Image 2



Image 3



Around 3:05 p.m., police officers moved across the Rotunda to clear the rioters out of that room, as seen below. *See* Image 4.

Image 4



Despite being mere feet from the police officers engaged in clearing the crowd, Hallon and Isaacs did not immediately leave the Rotunda. Instead, they remained in that room and continued to take photos with their mobile cameras, including one with the statute of President Gerald Ford. A photo of the Ford statute recovered from Isaacs's phone is below. *See* Image 5.

Image 5



Image 6



Hallon and Isaacs left the Rotunda only when police officers forced the rioters from that room around 3:14 p.m.

Image 7



Hallon and Isaacs finally exited through the same doors they entered the U.S. Capitol Building at approximately 3:16 p.m. *See* Images 8 and 9 below.

Image 8



Image 9



*Hallon's Post-arrest Communication with the FBI*

On May 4, 2021, FBI agents attempted to interview Hallon, but he informed them that he wished to consult first with an attorney. On May 24, 2021, Hallon, through his attorney, sent an email to the FBI detailing Hallon's perspective of his actions on January 6, 2021. In this email, he admitted traveling to Washington on January 4, 2021, with his partner and co-defendant, Traci Isaacs, his nephew, William Isaacs, and a friend, Leslie Gray to "peacefully exercise their rights."

Hallon wrote that on January 6, 2021, he and Isaacs went to the U.S. Capitol, where the crowd was told by an unidentified "religious person" that a request had been made to the USCP to allow the crowd to reach the steps of the U.S. Capitol. Hallon claimed that, shortly thereafter, he and Isaacs, along with the crowd, broke through a barrier on the East Front of the U.S. Capitol after being told by a USCP officer that it was "okay for them to go" closer to the building. Hallon provided no support for this statement, nor has the government found any evidence to substantiate it.

Hallon also claimed that "[a]t no . . . time were there any acts of violence being committed," on the East Front or near the Columbus Doors. However, Hallon's statement in his email that

8

USCP officers used tear gas against the rioters is at odds with his claim that no violence occurred. According to Hallon's own account, the "negative effects of the tear gas" caused them to treat themselves for burning eyes as a result of the crowd control measures.

Hallon then claimed that after some time, he and Isaacs saw people "coming and going" into the U.S. Capitol Building through the Columbus Doors and so they "decided to go inside and check it out from themselves." Hallon further claims that a USCP officer standing at the door said nothing to them as he and Isaacs entered. Once inside, they took pictures, including pictures with their "favorite President, President Ford." This is corroborated by texts between Hallon and Isaacs after January 6.

Hallon stated that, subsequently, they heard a loud noise and instructions from the police to leave, but Isaacs was "stuck near the statute of President Ford," and he requested police to help them exit safely. Hallon falsely claimed that because Isaacs was injured, "the police and the crowd opened a pathway so they could exit quickly." Video evidence from Capitol Close Circuit Video does not corroborate Hallon's assertions. CCV from the area shows Hallon around the Ford statute for a few minutes before she disappears off screen—under her own power. Hallon and Isaacs only exited the Rotunda once officers were able to expel rioters en masse from the room. CCV from the Columbus Doors shows that Hallon and Isaacs exited from the Rotunda, and through the Columbus Doors with no "pathway" opened by any police officers.

*The Charges and Plea Agreement*

On June 6, 2022, the United States charged Hallon by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104 (e)(2)(D) and (G). On June 15, 2022, law enforcement officers arrested him at his home in Florida. On June 16, 2022, the United States charged Hallon by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and

9

40 U.S.C. §§ 5104 (e)(2)(D) and (G). On December 14, 2022, pursuant to a plea agreement, Hallon pleaded guilty to Count Four of the Information, charging him with unlawfully Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Hallon agreed to pay $500 in restitution to the Architect of the Capitol.[2]

### III. Statutory Penalties

Hallon now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Hallon faces up to six months of imprisonment and a fine of up to $5,000. Hallon must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of 21 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

---

[2] There are two other cases related to Hallon's case: *United States v. Gray et al.*, 1:22-cr-338, before this court, and *United States v. William Isaacs*, 1:21-cr-28-16. Leslie Gray and Traci Isaacs are set for plea hearings before this court in the coming weeks, and William Isaacs was found guilty by a jury of multiple felonies on March 21, 2023 .

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Hallon's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Hallon, the absence of violent or destructive acts is not a mitigating factor. Had Hallon engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Hallon's case is his approach to the U.S. Capitol on the East Front. By Hallon's own admission, he was tear gassed by USCP—a clear warning sign and decision point—while nearing the Columbus Doors. Yet, even faced with this unmistakable indicator that his conduct was unlawful, Hallon continued to advance toward the U.S. Capitol. Similarly, while in the Rotunda, Hallon witnessed police officers clearing the U.S. Capitol Building by force but did not immediately leave. Instead, Hallon and his partner, Isaacs, stayed in the Rotunda to take pictures and selfies.

Finally, in his communication with the FBI, Hallon minimized his behavior and made unsupported justifications for his actions on January 6, 2021. To date, Hallon has not expressed sincere remorse for his actions.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 21 days incarceration in this matter.

### B. Hallon's History and Characteristics.

Hallon has no relevant criminal history and has been compliant with the conditions of his release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Hallon attempted to minimize and justify his behavior on January 6 with a mix of false statements (e.g., that police "opened a pathway" for Hallon and Isaacs to exit) and statements with no support (e.g., that a USCP officer told them it was "okay for them to go" past the barriers on the East Front), demonstrating a lack of remorse for his actions. Unlike many defendants charged with offenses arising out of January 6, the Government has not identified any social media posts in which Hallon boasts about his participation in the riot. However, his attempt to minimize and justify his behavior as discussed above demonstrates a lack of remorse for his actions and should not be overlooked.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Hallon based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Hallon has pleaded guilty to Count 4 of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

13

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Panayiotou*, 22-cr-55 (DLF), the defendant entered the Capitol approximately 10 minutes after it was breached. At one point, Panayiotou was stopped by multiple armed law enforcement officers. Rather than immediately leave the Capitol through the first exit he saw, Panayiotou ventured into the Rotunda before finally departing. Unlike Hallon, Panayiotou violated the conditions of his release by testing positive for marijuana three times, once after judicial admonishment. But like Hallon, Panayiotou failed to show remorse for his activities. Like Hallon, he pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). This Court sentenced Panayiotou to 14 days' intermittent confinement, as a condition of 36 months' probation. The Court also imposed a $1,500 fine and $500 restitution.

In *United States v. Nicholas Hendrix*, 21-cr-426 (CKK), the defendant, a veteran of the United States Army, entered the Capitol through the Rotunda Doors despite the presence of police officers who sought to deny access. Closed and blocked doors with shattered glass, blaring alarms, chanted demands from other rioters to "Let us in," demonstrated to Hendrix that his entry was prohibited. He was inside the Capitol for only 90 seconds. Like Hallon, he pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Judge Kollar-Kotelly sentenced Hendrix to 30 days' incarceration and 36 months' probation.

In *United States v. Janet Buhler*, 21-cr-510 (CKK), the defendant, like Hallon, ignored several red flags upon entering the Capitol Building, including the sound of flashbangs and the sight of plumes of smoke rising in the air, rioters scaling the scaffolding over the northwest staircase, and shards of broken glass on the ground as she entered the Senate Wing Door. Buhler also cheered as rioters physically pushed against USCP officers at the East Rotunda Doors. She entered the Senate Gallery and later deleted photographs from her phone documenting her entry into the United States Capitol. Like Hallon, she pleaded guilty to violating 40 U.S.C.

17

§ 5104()(2)(G). Judge Kollar-Kotelly sentenced Buhler to 30 days' incarceration and 36 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[4]

---

[4] Although other judges of this Court, have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses, this Court has rejected that view. *See United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).See, e.g., 18 U.S.C. § 3561(a)(3).

On the other hand, this Court and others have concluded that it has authority to impose a term of incarceration as a condition of probation under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. *See Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)). The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day

V.     **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence LUIS HALLON to 21 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

    Respectfully submitted,

    MATTHEW M. GRAVES
    United States Attorney
    D.C. Bar No. 481052

By:   /s/ *Kyle M. McWaters*
    Kyle M. McWaters
    Assistant United States Attorney
    D.C. Bar No. 241625
    601 D Street NW
    Washington, DC 20003
    (202) 252-6983
    kyle.mcwaters@usdoj.gov

---

period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

**CERTIFICATE OF SERVICE**

On this 19th day of April, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By: /s/ *Kyle M. McWaters*
Kyle M. McWaters
Assistant United States Attorney